IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

ARI T.,

    **Plaintiff,**

v.                                                                                Case No. 2:23cv686

**LELAND DUDEK[1],**
**Acting Commissioner of Social Security,**

    **Defendant.**

## OPINION AND ORDER

Ari T. ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of Defendant Leland Dudek, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under the Social Security Act. On June 17, 2024, the parties consented to the jurisdiction of the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. § 636(c)(1), and Federal Rule of Civil Procedure 73. ECF Nos. 11–12.

Presently before the Court is Plaintiff's brief in support of reversal and remand of the Commissioner's decision denying benefits, ECF No. 10, and the Commissioner's brief in support of the Commissioner's decision denying benefits, ECF No. 13. After reviewing the briefs, the undersigned makes this decision without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Eastern District of Virginia Local Civil Rule 7(J). For the following reasons, the Court **VACATES** the final decision of the Commissioner and **REMANDS** this action for reconsideration.

---

[1] On February 16, 2025, Leland Dudek became the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Leland Dudek for former Commissioner of Social Security Martin O'Malley in this matter.

## I. **PROCEDURAL BACKGROUND**

Plaintiff protectively filed an application for DIB on July 20, 2020, alleging disability due to severe major depression, borderline personality, anxiety, and eye scleritis. R. at 131.[2] Plaintiff's application was initially denied on June 19, 2021, and again denied upon reconsideration on October 12, 2021. R. at 130, 152.[3] On October 25, 2021, Plaintiff requested a hearing before an administrative law judge. R. at 182.

A hearing was held on May 18, 2022, at which Plaintiff appeared without representation before Administrative Law Judge William Pflugrath ("the ALJ"). R. at 44–85. Plaintiff, her sister, and an impartial vocational expert testified at the hearing. R. at 53–85. During the hearing, Plaintiff expressed hesitation about proceeding without representation. R. at 77. The ALJ continued with the hearing, but allowed Plaintiff thirty days to seek an attorney and request a supplemental hearing. R. at 78. A second hearing was held on September 19, 2022, at which Plaintiff appeared with representation before the ALJ. R. at 88. Plaintiff and a vocational expert testified at the second hearing. R at 100–28. On November 17, 2022, the ALJ issued a decision finding Plaintiff not disabled. R. at 18–36. Plaintiff filed a request with the Appeals Council to reconsider the ALJ's decision, which was denied on November 1, 2023, making the ALJ's decision the final decision of the Commissioner. R. at 1–3.

Having exhausted her administrative remedies, on December 22, 2023, Plaintiff filed a Complaint for judicial review of the Commissioner's decision. ECF No. 1. In accordance with the Supplemental Rules for Social Security Actions, on June 3, 2024, Plaintiff filed a brief in

---

[2] "R." refers to the certified administrative record that was filed under seal on March 19, 2024. ECF No. 5, pursuant to Eastern District of Virginia Local Civil Rules 5(B) and 7(C)(1).

[3] The ALJ notes that Plaintiff's claim for DIB was denied upon reconsideration on October 19, 2021. R. at 18. However, it appears to the Court that Plaintiff's claim was denied upon reconsideration on October 12, 2021.

2

support of reversal and remand of the Commissioner's decision. ECF No. 10. On July 2, 2024, the Commissioner filed a brief in support of the Commissioner's decision denying benefits. ECF No. 13. Plaintiff did not file a reply brief. Because the matter is fully briefed, it is now ripe for disposition.

## II. RELEVANT FACTUAL BACKGROUND

The Record included the following factual background for the ALJ to review:

Plaintiff was twenty-seven years old at the time of her alleged disability onset date of July 20, 2020. R. at 131. Plaintiff resides with her sister, niece, and two dogs. R. at 53–54. Plaintiff is a high school graduate, and her highest level of education includes some coursework from Tidewater Community College where she studied health information management. R. at 54–55, 560. Plaintiff has primarily worked as a cook, which required her to fill various roles in the kitchen, including helping with ordering, and attending meetings and events. R. at 56–58. Plaintiff last worked as an event cook at Topgolf in 2020. R. at 25. While not formally a supervisor, she was given additional responsibilities when working large events. R. at 57.

### A. Plaintiff's Medical Records Relevant to Alleged Mental Impairments[4]

By way of background, Plaintiff began Lexapro to treat major depression in 2019. *See* R. at 483 (noting that Plaintiff had been using Lexapro for approximately one year as of July 25, 2020). She reported to a psychiatric service provider that, as an adolescent, she had been prescribed Zoloft for depression but that she discontinued use when she turned eighteen and no longer received assistance due to her age. R. at 527–28. At the time she discontinued this medication, she felt her symptoms were managed. R. at 528.

---

[4] Plaintiff also suffers from Steven-Johnson syndrome, episcleritis, psoriasis, chronic plaque, and fibromyalgia symptoms. R. at 254, 492, 578. Because Plaintiff's physical impairments are not at issue, the Court does not address Plaintiff's medical records relating to her physical impairments.

3

After running out of Lexapro in June 2020 and lacking this medication for approximately two weeks, Plaintiff was voluntarily admitted to Virginia Beach Psychiatric Center for inpatient treatment. R. at 479. She told treatment providers that her depression was worsening due to both running out of her Lexapro and interpersonal difficulties at work. R. at 416, 479. During her mental status examination, Plaintiff stated that she was depressed and that she had experienced suicidal ideation earlier in the day that had since abated. R. at 480. She presented otherwise normally, displaying grossly intact memory and cognition, normal insight and judgment, adequate hygiene, linear and logical thought process, and unremarkable thought content. R. at 480. Plaintiff restarted Lexapro, began Trazodone for insomnia, and her symptoms showed signs of improvement. R. at 481–82. Plaintiff was discharged five days later, and treatment managers recommended that she receive outpatient therapy and medication management services. R. at 482. Prior to discharge, Plaintiff interacted positively with staff and peers and did well on her medication regimen, presenting no side effects and reaching a stable baseline. R. at 481–82.

Following Plaintiff's discharge from inpatient treatment, she attended biweekly talk therapy and continued medication management with her primary care provider. R. at 424–26. Plaintiff reported to her primary care provider in October 2020 that she was not sure if her prescribed Hydroxyzine was helping her anxiety, and she was instead prescribed Buspirone. R. at 424, 426. She was advised to continue Lexapro to treat her depression, and Trazodone to treat her insomnia. R. at 424.

Plaintiff transferred her medication management to Alpha Psychiatry Services in April 2021. R. at 532. At her initial appointment, Plaintiff reported having "daymares" during which she "sees herself and sometimes just walks out of the house." R. at 532. At a follow up appointment, she reported an increase in irritability, anhedonia, and concentration, and that things

have been stressful, but that she was "doing alright." R. at 527. In May of 2021, Plaintiff reported an increase in her "daymare" symptoms, as well as mood swings and an elevated mood which had affected her judgment and behavior daily for the past few weeks. R. at 552. A few months later, Plaintiff reported her current medication was not helping, and that she was experiencing frequent, bad, mood swings. R. at 542. By August of 2021, Plaintiff reported that her medication was helping with her mood symptoms. R. at 536. However, Plaintiff complained that she had developed focus issues, though she denied that she experienced insomnia, differences in social behavior, mood changes, suicidal thoughts, forgetfulness, anxiety, or depression. R. at 536, 539. In response to her symptoms relating to focus, her medication provider prescribed her Adderall. R. at 540. During her appointments for medication management, Plaintiff had normal mental status examinations, which demonstrated a full range of affect, normal mood and thought process, and that she was alert and oriented. R. at 529, 534, 539, 545, 550, 555.

In 2022, Plaintiff continued treatment with Alpha Psychiatry Services and also attended ten counseling sessions with a Licensed Clinical Social Worker, Michelle Walter ("LCSW Walter"). *See e.g.*, R. at 638–61. From January to August 2022, she consistently reported to Alpha Psychiatry that her psychiatric symptoms were relieved by her medication. R. at 642–44, 646–48, 650–52, 654–56, 658–60. In January 2022, she reported that her medication was "moderately managing her symptoms" and that she was "really in a good place now." R. at 658. Plaintiff reported fatigue and low energy, but her primary care provider determined the cause was low iron and managed her symptoms. R. at 654, 650. Otherwise, Plaintiff reported at each appointment that her medication was helpful in managing her symptoms. *See* R. at 650 ("medication has really helped"); R. at 646 ("medicine is definitely work[ing]"); R. at 642 ("Patient report[s] doing well

with the medication now and feels the combination is working"). Her mental status exams remained normal. R. at 648, 644, 655–56, 660.

Despite the generally positive reports to Alpha Psychiatry, Plaintiff reported varying symptoms of depression over the course of her sessions with LCSW Walter between April 21 and June 27, 2022. R. at 638–41. In April 2022, Plaintiff attended a dinner reception for her sister, but needed to stay on her phone so she would not get anxious. R. at 641. Plaintiff reported that her sister was upset with her for not paying attention at the reception. R. at 641. On May 16, 2022, Plaintiff reported to LCSW Walter that she felt she was slipping into a depressive episode. R. at 638–40. At that time, she was sleeping more and having difficulty motivating herself. R. at 640. A few days later, on May 23, 2022, Plaintiff was having significant difficulty getting out of bed and felt like her life had no meaning to it. R. at 639. In early June 2022, Plaintiff presented as slightly more depressed, and slept through most days, and accomplished little during her depressive episode. R. at 640. On June 6, 2022, Plaintiff had a good weekend after being in bed for two days, and she was able to motivate herself to participate in family activities. R. at 638. She felt that her depressive episode was possibly shorter and not as deep as her previous episode, and that medication was helping her symptoms. R. at 638. By June 20, 2022, Plaintiff had productive days where she was able to wake up by 8:45 A.M. and do some work around the house, such as cleaning. R. at 638.

On May 31, 2022, LCSW Walter filled out a form in which she noted that Plaintiff's ability to function varied substantially depending on the cycle of her mood and that she could experience depressive episodes lasting for months. R. at 634–35. In this form, LCSW Walter also opined that, while in a depressive episode, Plaintiff suffered extreme limitations in understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and

6

concentration for prolonged periods, performing scheduled activities, maintaining regular attendance and punctuality, sustaining an ordinary routine independently, completing a normal workday or week without being interrupted by psychological symptoms, performing consistently without unreasonable rest periods, accepting instructions or responding appropriately to supervisors' criticism, and setting realistic goals or plans independently. R. at 634–35.

On June 29, 2022, Plaintiff participated in an annual assessment for continued mental health services. R. at 665–74. Despite her generally positive reports to Alpha Psychiatry, and reports to LCSW Walter that medication was helping her symptoms, Plaintiff claimed that she was not taking her medications consistently and that she was experiencing suicidal ideation, severe depression, extreme isolation behavior, mood swings, and hallucinations. R. at 665–67. Her niece also told the assessor that Plaintiff would barely leave her bed during some periods but that on her good days, Plaintiff would be more energetic and occasionally play sports with her. R. at 665–66. Two weeks later, at an appointment with Alpha Psychiatry Services, Plaintiff denied experiencing these symptoms, reported that she was consistently taking her medication, and stated that her medication was working. R. at 665–66.

B. **Relevant Mental Evaluations Completed by State Agency Examiners**

At the request of the agency, Karen M. Armstrong Ph.D., conducted a consultative examination on June 9, 2021. R. at 560. During the examination, Plaintiff expressed that she understood that she could work and that she knew that she had cooperated well with coworkers and superiors in the past. R. at 560. However, Plaintiff further explained that she had been bullied by a particular manager at Topgolf where she had worked as a cook, and that despite her logical understanding that she was capable of working, this experience made the idea of employment under a boss too stressful. R. at 560. Following an examination, it was Dr. Armstrong's opinion

that Plaintiff lacked a limitation that would prevent her from understanding and following simple instructions, and Dr. Armstrong further opined that Plaintiff could handle more complex instructions when not stressed. R. at 562.

At the initial level of review, state agency psychologist Richard Milan, Jr., Ph.D., conducted an independent review of the record. R. at 137–38. He determined that Plaintiff was capable of: carrying out short and simple instructions; performing simple, routine, and repetitive work in a stable environment; working on simple tasks for two-hour periods occasionally interrupted by flare ups of her symptoms; asking simple questions; accepting instruction; completing simple tasks requiring occasional interaction with coworkers or the public; and responding appropriately to non-confrontational and constructive supervision. R. at 137–38.

On reconsideration of Plaintiff's record, state agency psychologist Howard Leizer, Ph.D. found that Plaintiff was capable of recalling short, simple instructions but would have difficulty with understanding or recalling complex, detailed information. R. at 148. He also found that she could remain concentrated and attentive for two-hour stretches to successfully complete an eight-hour workday, interact appropriately with her coworkers and supervisors, and complete a standard work week at a comparable performance to others with only a minimal need for infrequent accommodations. R. at 148–49.

### C. Testimony at the ALJ Hearing

At Plaintiff's first ALJ hearing on May 18, 2022, she testified that she was hospitalized for five days in July 2020 following issues with her supervisor at Topgolf. R. at 58. After receiving medication, Plaintiff was stabilized and doing well with the assistance of medication. R. at 58. Plaintiff was taking classes at Tidewater Community College, but she had to withdraw due to being in a "down" period. R. at 60. As for her physical limitations, Plaintiff explained that she

experienced pain in her back and hips. R. at 62. She saw a chiropractor, which she found helped her symptoms. R. at 63. Plaintiff testified that she had days where she could get out of bed for three or four days in a row. R. at 63–64. Her medication made her "down" times shorter and her "up" times longer. R. at 66.

Plaintiff's sister, with whom she lives, also testified at the hearing. R. at 69. Her sister testified that when Plaintiff is "up," she can function well, and help out around the house. R. at 69. However, when Plaintiff is "down," her sister needs to ask others to help take care of the dogs, and Plaintiff has a difficult time leaving bed and eating. R at 70. Plaintiff's sister explained that a counselor comes to the house twice a week to help Plaintiff get out of bed. R. at 70. Her sister also testified about an incident where Plaintiff considered suicide, but did not do so because Plaintiff's niece was in the car with her. R. at 72.

At Plaintiff's second ALJ hearing on September 19, 2022, Plaintiff was represented by an attorney, Erick Bowman. There, Plaintiff testified further that she suffers from agoraphobia and has problems leaving the home. R. at 100. She explained that a counselor comes over twice a week to try to get Plaintiff to go to grocery stores. R. at 101–02. Plaintiff also testified about her diagnosis of Stevens-Johnson syndrome, which causes sensitivity to light and scarring on Plaintiff's eyes. R. at 102–03. When Plaintiff has a flare up, her eye is inflamed and leaks, and her symptoms make it difficult to look at TV or computer screens. R. at 104, 109. Stevens-Johnson syndrome also causes Plaintiff psoriasis symptoms on her legs. R. at 105–06.

### III. THE ALJ'S DECISION

To determine if the claimant is eligible for benefits, the ALJ conducts a five-step sequential evaluation process. 20 C.F.R. § 404.1520; *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015) (summarizing the five-step sequential evaluation). At step one, the ALJ considers whether the

claimant has worked since the alleged onset date, and if so, whether that work constitutes substantial gainful activity. § 404.1520(a)(4)(i). At step two, the ALJ considers whether the claimant has a severe physical or mental impairment that meets the duration requirement. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant has an impairment that meets or equals the severity of a listed impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. § 404.1520(a)(4)(iii). If the claimant does not have an impairment that meets or equals the severity of a listed impairment, the ALJ will determine the claimant's residual functional capacity, that is, the most the claimant can do despite her impairments. § 404.1545(a). At step four, the ALJ considers whether the claimant can still perform past relevant work given his or her residual functional capacity. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ considers whether the claimant can perform other work. § 404.1520(a)(4)(v).

The ALJ will determine the claimant is not disabled if: they have engaged in substantial gainful activity at step one; they do not have any severe impairments at step two; or if the claimant can perform past relevant work at step four. *See Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014). The ALJ will determine the claimant is disabled if the claimant's impairment meets the severity of a listed impairment at step three, or if the claimant cannot perform other work at step five. *Id.*; *see also Mascio*, 780 F.3d at 634–35 (noting the ALJ will only determine the claimant's residual functional capacity if the first three steps do not determine disability).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law:

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of July 20, 2020. R. at 20. At step two, the ALJ found that

Plaintiff had the following severe impairments: depressive, bipolar and related disorders; anxiety and obsessive-compulsive disorders, and personality disorders. R. at 20. At step three, the ALJ considered Plaintiff's severe impairments and found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. at 22–24.

After step three, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light level work, with the following limitations:

> She can frequently but not always climb stairs and crawl. She can only occasionally climb ladders. She can have no more than frequent exposure to extreme cold or heat. She can have no more than occasional exposure to vibration. She can have no exposure to sustained loud noises, to workplace hazards such as unprotected heights or dangerous machinery, or to bright lights. She is limited to jobs that do not require bilateral visual acuity (she is only able to look out of one eye). She is limited to performing only simple, repetitive, and routine tasks. She is limited to only nonproduction-paced tasks as to tempo and capacity (i.e., non-assembly line work). She is limited to maintaining a persistent effort on only routine tasks. She is limited to only rare interaction with the public [defined as 5% of the time]. She is limited to only occasional interaction with coworkers and supervisors. She must have reasonable access to a restroom, that is, work on the same floor or in an office setting.

R. at 24–25. In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p." R. at 25.

At step four, the ALJ determined that Plaintiff was incapable of performing her past relevant work as a cook. R. at 34  While Plaintiff cannot resume her prior employment, the ALJ determined at step five that Plaintiff could perform other jobs that exist in significant numbers in the national economy. R. at 35. Thus, the ALJ determined that Plaintiff was not disabled from

the alleged onset date, July 20, 2020, through the date of his decision, November 17, 2022. R. at 36.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It consists of 'more than a mere scintilla of evidence but may be somewhat less than a preponderance.'" *Britt v. Saul*, 860 F. App'x 256, 260 (4th Cir. 2021) (quoting *Craig*, 76 F.3d at 589). The Court looks for an "accurate and logical bridge" between the evidence and the ALJ's conclusions. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016); *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589. If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

Though phrased as a single issue, Plaintiff's appeal to this Court raises several challenges to the ALJ's decision. Plaintiff alleges that the ALJ erred by: (1) relying on a lack of objective medical evidence to discredit Plaintiff's mental health complaints; (2) improperly characterizing Plaintiff's mental health treatment as "conservative;" and (3) cherry-picking mental health evidence during Plaintiff's "up days" to deny her claim. ECF No. 10 at 11–16. The Court addresses each challenge in turn below.

### A. The ALJ Improperly Evaluated Plaintiff's Subjective Complaints Regarding Her Mental Health Symptoms.

First, Plaintiff argues that the ALJ improperly relied on a lack of objective medical evidence to discredit Plaintiff's mental health complaints. ECF No. 10 at 11. Plaintiff contends that consistent with *Arakas v. Commissioner of Social Security* and *Shelley C. v. Commissioner of Social Security*, the ALJ was not permitted to rely upon a lack of objective evidence to discredit Plaintiff's subjective complaints about the severity of her mental health symptoms. *Id.* at 11–16. In response, the Commissioner argues that the ALJ did not suggest or require that Plaintiff's limitations be validated by objective support. ECF No. 13 at 17. The Commissioner contends that Plaintiff's own subjective reports that her mental health symptoms improved with the medication prescribed discredited her own subjective complaints. *Id.* The Commissioner maintains that the ALJ did not violate the Fourth Circuit's rulings in *Arakas* or *Shelley C.* in evaluating Plaintiff's subjective symptoms. *Id.* at 17-19.

To evaluate a claimant's subjective complaints in the context of an RFC determination, the ALJ must conduct a two-step analysis. *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020); § 404.1529(a). At step one, the ALJ must determine "whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to

produce the claimant's alleged symptoms." *Id.* (citing § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3). At step two, the ALJ must evaluate the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and perform basic work activities. *Id.* (citing § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4). To evaluate the individual's symptoms, the ALJ looks to whether Plaintiff's subjective complaints could "reasonably be accepted as consistent with the objective medical evidence and other evidence." *Craig*, 76 F.3d at 595. However, the ALJ cannot "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. *Arakas*, 983 F.3d at 95 (citing SSR 16-3p, 2016 WL 1119029 at *5) (internal quotation omitted); *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989) ("there need not be objective evidence of the pain itself or the intensity"). Because symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques, at step two, the ALJ must consider the entire case record to assess the limiting effects of the individual's symptoms. *Arakas*, 983 F.3d at 95.

Importantly, in *Arakas*, the Fourth Circuit made clear that "ALJs may not rely on objective medical evidence (or the lack thereof)—*even as just one of multiple factors*—to discount a claimant's subjective complaints regarding symptoms of…[a] disease that does not produce such evidence." *Id.* at 97 (emphasis added). And, in *Shelley C.*, the Fourth Circuit made clear that chronic depression is a disease that does not produce such objective medical evidence, and accordingly, ALJs may not rely on the absence of objective medical evidence to discredit a claimant's subjective complaints regarding their depressive symptoms. *Shelley C. v. Comm'r of SSA*, 61 F.4th 341, 346 (4th Cir. 2023).

14

Here, pursuant to step one of the analysis, the ALJ considered the evidence and found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. R. at 26. Pursuant to step two of the analysis, the ALJ found that Plaintiff's statements about the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. R. at 26. The ALJ acknowledged Plaintiff's testimony that her symptoms have included:

> suicidality, depressed mood, low energy, trouble with motivation, difficulty concentrating, distractibility, fatigue, worry, irritability and anger when anxious, increased thoughts of self-harm, mood cycling and symptoms of hypomania, daymares where she sees herself hurting herself, difficulty getting out of bed to go to the bathroom or shower, sleep and appetite disturbance, dissociation, isolative behaviors, panic attacks, and hallucinations.

R. at 27.

However, in evaluating Plaintiff's RFC and the intensity, persistence, and limiting effects of Plaintiff's mental health symptoms, the ALJ relied, in part, on objective medical evidence and Plaintiff's normal mental status findings in discounting Plaintiff's subjective complaints regarding her symptoms at various points throughout his decision. For example, in evaluating Plaintiff's ability to maintain attention, concentration, and pace, the ALJ noted that "[a]lthough claimant reports other significant limitations, these are not well-supported by the medical evidence showing positive response to medication and good cognition on exam." R. at 29. Similarly, the ALJ acknowledged that Plaintiff reported "crippling anxiety" but found that on exam, "she had unremarkable receptive and expressive language." R. at 29. The ALJ concluded that Plaintiff "does not appear to be entirely homebound, and her mental status exams and activities demonstrate that she can interact with others on a limited basis." R. at 30. Further, in evaluating LCSW Walter's opinion, the ALJ noted that LCSW Walter's "notes mainly document claimant's subjective complaints with no diagnoses or plan. Her opinions are also inconsistent with the many

15

normal mental status findings claimant has had in her medication management visits…." R. at 34. Thus, the ALJ recognized Plaintiff's subjective complaints about the severity and intensity of her symptoms, but found that those complaints were unsubstantiated, at least in part, by her normal mental status exams.

The ALJ did rely on other, non-objective evidence to find that Plaintiff's limitations were not disabling, including her own statements that her medication was helping her symptoms. *See, e.g.*, R. at 23 ("medication has helped her irritation, anxiety, and mood swings"); R. at 29 ("she was able to get up every morning around 8:45 a.m. and have productive days of cleaning and/or doing some kind of work around the house"); R. at 29 ("[f]unction reports indicate that she can drive, shop, prepare sandwiches, frozen meals, and pre-cooked foods, and follow written instructions well"). However, by relying on objective medical evidence as one of multiple factors to discount Plaintiff's subjective complaints about the severity and intensity of her symptoms, the ALJ's analysis provided reasoning that *Arakas* and *Shelley C.* forbids.

The Commissioner argues that *Shelley C.* "does not hold that the medical evidence is irrelevant or may not be considered by an ALJ when evaluating a claimant's symptoms" and argues that the regulations allow objective medical evidence to be considered as one of many factors considered in evaluating an individual's symptoms. ECF No. 13 at 16–17. While the regulations generally do allow objective medical evidence to be considered as one of many factors in evaluating an individual's symptoms, the Commissioner's reading ignores the holdings of *Arakas* and *Shelley C.*, which are specific to evaluating symptoms of diseases that do not produce objective medical evidence as to the intensity, persistence, and limiting effects of the claimant's symptoms. In such instances, "ALJs may not rely on objective medical evidence (or the lack thereof)—*even*

16

*as just one of multiple factors*—to discount a claimant's subjective complaints regarding [their] symptoms."[5] *Arakas*, 983 F.3d at 97; *Shelley C.*, 61 F.4th at 360.

Here, the ALJ relied on objective medical evidence as one of multiple factors to discount Plaintiff's subjective complaints regarding her depressive symptoms. Accordingly, remand is warranted.

### B. On Remand, the ALJ Should Consider Plaintiff's Remaining Arguments.

As to Plaintiff's remaining arguments, Plaintiff contends that the ALJ improperly characterized Plaintiff's mental health treatment as "conservative;" and cherry-picked mental health evidence during Plaintiff's "up days" to deny her claim. ECF No. 10 at 11–16. In response, the Commissioner argues that the ALJ reasonably described Plaintiff's treatment as conservative, and that the ALJ did not cherry-pick only supporting evidence. ECF No. 13 at 19–23.

First, Plaintiff points to the Fourth Circuit's finding in *Shelley C.* that the ALJ erred by concluding Plaintiff's treatment was routine and conservative. ECF No. 10 at 11. In *Shelley C.*, the Fourth Circuit noted that "[a] growing number of district courts have held that in cases where claimants consume antidepressant, anticonvulsant, and/or antipsychotic drugs, consistently attend

---

[5] The Commissioner cites two cases in support of the proposition that *Shelley C.* "does not hold that the medical evidence is irrelevant or may not be considered by an ALJ when evaluating a claimant's symptoms." ECF No. 13 at 16 n.6 (citing *Anthony P. v. O'Malley*, No. 1:22cv291, 2024 WL 965608, at *3 (E.D. Va. Mar. 6, 2024) and *Jarius B. v. O'Malley*, No. 3:22cv748, 2024 WL 1356680, at *3 (E.D. Va. Mar. 28, 2024)). However, other courts in the Fourth Circuit find the opposite, as the Court does today— that when evaluating symptoms of a condition that does not produce such evidence, ALJs cannot rely on objective medical evidence as a factor to discount a claimant's subjective complaints. *See Jamoya A. v. O'Malley*, No. 3:22cv804, 2024 WL 899419, at *10 (E.D. Va. Feb. 12, 2024) (rejecting the Commissioner's argument that the ALJ complied with *Arakas* by considering Plaintiff's stated ongoing capabilities in addition to objective medical evidence because such evidence "cannot serve as even one factor considered in discounting Plaintiff's subjective complaints."), *report and recommendation adopted*, No. 3:22cv804, 2024 WL 897606 (E.D. Va. Mar. 1, 2024); *Cynthia P. v. Kijakazi*, No. CV 21-434, 2022 WL 20699809, at *2 (D. Md. Mar. 2, 2022) (remanding where ALJ cited objective medical evidence in addition to plaintiff's daily activities in determining plaintiff's subjective complaints were not credible); *Caleca v. Comm'r of Soc. Sec.*, No. 1:21cv131, 2022 WL 3205175, at *3 (W.D.N.C. Aug. 8, 2022) (remanding where ALJ relied, at least in part, on objective medical evidence to discount Plaintiff's subjective complaints regarding symptoms of fibromyalgia).

visits with mental health professions, and endure constant medication adjustment and management, their treatment is classified as anything but 'routine and conservative.'" 61 F.4th at 363. There, "[a]t each step of [the plaintiff's] mood and affect, [her psychiatrist] attempted to curb her symptoms with medication management. At multiple points, the record depict[ed] [the plaintiff's] medication adjustment, prescriptions for new medications, and the balancing and tapering of her existing medications. *Id.* The medication that the Plaintiff in *Shelley C.* used included Wellbutrin, Cymbalta, Ativan, Adderall, Zyprexa, and Progesterone, which are atypical antidepressants, serotonin-norepinephrine reuptake inhibitors, benzodiazepines, and atypical antipsychotics. *Id.*

Here, in describing Plaintiff's treatment, the ALJ stated that Plaintiff "was psychiatrically hospitalized on one occasion, she has since been treated on a conservative basis and done better with medication," R. at 24, and that since her hospitalization, "she has had only conservative treatment." R. at 27. Because Plaintiff was prescribed some of the same medications as the plaintiff in *Shelley C.*, which required frequent adjusting and medication management, the ALJ is advised to consider whether to classify Plaintiff's treatment as "conservative" in light of the Fourth Circuit's ruling in *Shelley C.*.

Similarly, *Shelley C.* cautions ALJs against cherry-picking from the record by "highlighting [] good moments and bypassing the bad." 61 F.4th at 362. Here, the ALJ noted that "[f]or a part of June 2022, [Plaintiff] was going through a depressive episode and was sleeping most of her days and accomplishing little." R. at 27. Upon reviewing the record, Plaintiff began slipping into a depressive episode on May 16, 2022. R. at 640. A few days later, Plaintiff presented as slightly more depressed, had difficulty getting out of bed for the previous week, and felt that her life had no meaning to it. R. at 639. She did not return to having productive days until

18

June 20, 2022. R. at 638. On remand, the ALJ is advised to ensure the decision reflects that all the evidence was considered, including Plaintiff's bad days.

## VI. <u>CONCLUSION</u>

For the foregoing reasons, the Court **VACATES** the final decision of the Commissioner and **REMANDS** this action for further consideration. The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to the counsel of record for Plaintiff and the Commissioner.

/s/ Lawrence R. Leonard
Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
March 31, 2025